IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| BUILDING MATERIALS CORPORATION OF AMERICA, et al., | : : : : : | |
| Plaintiffs, | : : | |
| v. | : : : | CIVIL ACTION No: 06-1490 |
| MARTIN J. ROTTER, et al., Defendants. | : : : | |

February 15, 2008                                                          Anita B. Brody, J.

**MEMORANDUM AND ORDER**

Plaintiffs Building Materials Corporation of America, d/b/a GAF Materials Corporation ("GAFMC") and Building Materials Investment Corporation ("BMIC") [the aforementioned plaintiffs will be collectively referred to as "GAFMC"] brought this action against Martin J. Rotter, Ventco, Inc. ("Ventco") and Mongoose Products, Inc. ("Mongoose") [the aforementioned defendants will be collectively referred to as "Rotter"].  GAFMC's alleges that Rotter engaged in: (1) two counts of breach of contract; (2) common law trademark infringement; (3) false designation of origin in violation of 15 U.S.C. § 1125(a); (4) trademark dilution; (5) false and misleading advertising; (6) product disparagement; (7) unfair competition; and (8) constructive trust disgorgement.  Rotter raises the following counterclaims against GAFMC: (1) four antitrust counts in violation of 15 U.S.C. §§ 1 and 2; (2) false advertising in

1

violation of 15 U.S.C. § 1125(a); (3) unfair competition; (4) tortious interference with prospective business advantage; (5) three counts of breach of contract; (6) fraud; (7) breach of the covenant of good faith and fair dealing; (8) unjust enrichment; (9) civil conspiracy; and (10) fraud and misrepresentation.  Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367.

Currently before me is GAFMC's motion to dismiss the following counterclaims: (1) the four antitrust counts, which allege violations of 15 U.S.C. §§ 1 and 2; (2) unfair competition; (3) tortious interference with prospective business advantage; (4) civil conspiracy; (5) fraud; and (6) fraud and misrepresentation.   For the reasons stated below, I grant GAFMC's motion to dismiss Rotter's counterclaims alleging violations of the 15 U.S.C. §§ 1 and 2.  I do not permit Rotter leave to amend his counterclaims in order to re-plead the antitrust violations.[1]  Additionally, I deny GAFMC's motion to dismiss the state law claims.

## I. BACKGROUND[2]

Plaintiff GAFMC is the dominant manufacturer and marketer of commercial and residential roofing products and accessories.  Defendant Martin J. Rotter is the named inventor of

---

[1] I do not grant Rotter the chance to re-plead the antitrust violations because I already gave him this opportunity.  In my June 26, 2007 Order (Doc. #35), I gave Rotter the right to file an amended counterclaim. When Rotter filed his amended counterclaim, he was already on notice that he may not have properly stated the relevant product market because GAFMC had already filed a motion to dismiss Rotter's original counterclaims (Doc. #15), in which it asserted that he had failed to allege a relevant product market.

[2] In reviewing a motion to dismiss pursuant to 12(b)(6), "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party." *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir. 1987).  Because this is a motion to dismiss directed to defendants' counterclaims, I state the facts in the light most favorable to the defendants.

the Cobra Ridge Vent, an attic ventilation product. In 1992, GAFMC and Rotter entered into a Patent and Know-How Agreement. In the agreement, GAFMC agreed to pay Rotter royalties for ten years on products sold by GAFMC employing the Cobra Technology. In exchange, Rotter granted GAFMC exclusive license to the existing patents related to the Cobra Technology and to any inventions related to the Cobra technology that Rotter developed during the period in which he received royalties. Under the agreement, GAFMC owed Rotter a duty to use its best efforts to develop, market and sell products utilizing the technology. However, GAFMC refused to perform this obligation.

The Patent and Know-How Agreement terminated in July 2002 and on September 5, 2002, Rotter received the final royalty payment from GAFMC. In August 2004, more than two years after termination of the Patent and Know-How Agreement, Rotter began work on a different ridge vent for asphalt roofs. The patent applications for this ridge vent were initially filed on January 31, 2005. These patent applications described the asphalt roof ridge vent product that Rotter planned to market as the Mongoose Ridge Vent. In 2005, Rotter began selling the Mongoose Ridge Vent. Both the Cobra Ridge Vent and the Mongoose Ridge Vent require, as an essential component of manufacture, the use non-woven mesh.

Rotter claims that GAFMC breached its contract with him by failing to use its best efforts to develop, market, and sell products using the Cobra Technology. Additionally, Rotter alleges that GAFMC engaged in several other violations of the law, many of which are the result of the reliance by both Cobra and Mongoose on the use of non-woven mesh in their manufacture. Rotter alleges that in 2005, there were only four United States suppliers of non-woven mesh: Loren Products ("Loren"), Glit/Microtron ("Glit"), Americo, and Washington International Non-

Wovens, LLC ("WIN").  However, Loren and Glit were both owned by the same corporate parent, KATY Industries ("KATY").

In 2005, GAFMC had contracts with KATY and Americo to supply non-woven mesh. GAFMC's contract with Americo was for an exclusive supply of non-woven mesh that prevented Americo from selling it to other roofing companies.  In 2005, Rotter had a contract to purchase non-woven mesh from WIN.  In August 2005, KATY announced that it had purchased WIN.

Rotter alleges that GAFMC engaged in contract talks with KATY in which an agreement was reached that KATY would exclusively provide non-woven mesh to GAFMC, as long as GAFMC guaranteed a yearly amount of business.  Rotter claims that GFAMC had no need for this exclusive contract and that GFAMC entered the exclusive agreement with the intent to harm Mongoose.  As a result of these contract talks, Rotter alleges that in August/September of 2005, KATY stopped selling non-woven mesh to Rotter for use in the Mongoose product.  Due to GAFMC's exclusive contracts with Americo and KATY, the only U.S. suppliers of non-woven mesh, Rotter was forced to purchase non-woven mesh from overseas.

## II.  LEGAL STANDARD

According to Fed. R. Civ. P. Rule 12(b)(6), a court must grant a motion to dismiss if the plaintiff fails "to state a claim upon which relief can be granted."  In deciding a motion to dismiss pursuant to Fed. R. Civ. P. Rule 12(b)(6), the court must accept as true the well-pleaded allegations of the complaint and draw all reasonable inferences in the plaintiff's favor.  *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 452 (3d Cir. 2006).  However, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007) (internal quotations omitted).

### III.  DISCUSSION

**A.  Sherman Act - Section 1**

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  Rotter alleges that GAFMC's agreement with KATY to exclusively supply non-woven mesh for use in asphalt ridge products to GAFMC illegally restrained trade in violation of Section 1.

"Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason." *Bus. Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717 (1988).  In *Bus. Electronics*, the United States Supreme Court held that courts should apply the rule of reason in cases involving vertical non-price restraints,.  485 U.S. at 724.  Additionally, in 2007, the United States Supreme Court held that all "[v]ertical price restraints are to be judged according to the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 127 S. Ct. 2705, 2725 (2007).  In this case, both parties agree that their dispute involves a non-price related vertical agreement between GAFMC and KATY.  Therefore, the rule of reason is the appropriate standard to use in determining whether GAFMC has illegally restrained  trade.

To establish a violation of 15 U.S.C. § 1, Rotter must prove: (1) concerted action by

5

GAFMC; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that Rotter was injured as a proximate result of the concerted action. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.* 124 F.3d 430, 442 (3d Cir. 1997). Rather than analyze each factor necessary to establish a Section 1 violation, I will focus my attention on the second prong of this test that requires a plaintiff, in its claim, to allege a relevant product market.

The party asserting a violation of Section 1 always has the burden of defining the relevant product market. *Id*. at 436. "The relevant product market is defined as those 'commodities reasonably interchangeable by consumers for the same purposes.'" *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1992) (quoting *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Queen City*, 124 F.3d at 436 (quoting *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962)). Reasonable interchangeability of use "implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Id*. at 437 (quoting *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 206 (3d Cir. 1994). In assessing reasonable interchangeability, a court should consider price, use, and qualities. *Tunis Bros.*, 952 F.2d at 722. "The products in a relevant product market [should] be characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Id*.

While "[i]t is true that in most cases, proper market definition can be determined only

after a factual inquiry into the commercial realities faced by consumers," there is no "*per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed.R.Civ.P. 12(b)(6)." *Queen City*, 124 F.3d at 436.  According to the Third Circuit:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Id*.  Hence, "if a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand, . . . a court may grant a Rule 12(b)(6) motion." *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993) (cited by *Queen City*, 124 F.3d at 437).

In *Fresh Made, Inc. v. Lifeway Foods, Inc.*, the court granted the defendant's motion to dismiss the antitrust claims because the plaintiff did "not ground its allegations regarding product market with reference to the rule of reasonable interchangeability and cross-elasticity of demand. 2002 WL 31246922, *5 (E.D. Pa. 2002); *Accord Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.*, 2003 WL 22797730, *5 (dismissing an antitrust counterclaim because it "failed to define the relevant product market with reference to the rule of reasonable interchangeability of use or cross-elasticity of demand.").  The plaintiff in *Fresh Made* identified the relevant product market as specialty Russian foods, including kefir (a yogurt type drink).  *Id*.  However, the plaintiff did "not allege facts establishing that the market for specialty Russian dairy products, such as kefir, [was] distinct from the market for yogurt, other drinkable yogurt products, or from other dairy products in general."  *Id*.  Additionally, there were "no allegations relating to the price

of and/or the demand for kefir and other specialty Russian dairy products relative to products in the larger dairy market as a whole." *Id*. Furthermore, the plaintiff did not clarify "what relationship kefir [had] to other specialty Russian dairy products or why they [were] appropriately in the same product market." *Id*. The court dismissed the antitrust claim because the plaintiff failed to state whether there were any reasonably interchangeable alternatives for its products and did not explain why kefir and other specialty Russian dairy products formed an appropriate relevant market. *Id*. at *5-6.

In this case, Rotter alleges that the relevant product market is asphalt shingle roof ridge vents. However, in neither his counterclaims nor his brief in response to the motion to dismiss, does Rotter provide any factual basis nor analysis to support his bare assertion that the relevant market is asphalt shingle roof ridge vents. All that Rotter says in his counterclaim is that "[t]here is a relevant market for asphalt shingle roof ridge vent products . . . ." Amended Counterclaims, para. 103. Rotter does not explain why asphalt shingle roof ridge vents are distinct from the market for shingle roof ridge vents, roof ridge vents in general or any other roofing products. Rotter makes no reference to the price of and/or demand for asphalt shingle roof ridge vents relative to the roofing products industry as a whole. Rotter defines the relevant product market without reference to the rule of reasonable interchangeability and the cross-elasticity of demand.

This Court is not required to accept Rotter's definition of the relevant product market because it is "a legal conclusion couched as a factual allegation" that is unsupported by Rotter's filings. *See Papasan*, 478 U.S. at 286. There is no need to examine the other factors in the rule of reason test because Rotter's counterclaim fails to state a relevant product market for antitrust purposes. As a result of Rotter's failure to support his definition of the relevant product market,

I grant GAFMC's motion to dismiss the counterclaim alleging violation of 15 U.S.C. § 1

**B.  Sherman Act - Section 2**

Section 2 of the Sherman Act states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations shall be deemed guilty of a felony." 15 U.S.C. § 2. Rotter alleges three counts of violation of Section 2. He claims that GAFMC: (1) maintained a monopoly over the asphalt shingle roof ridge vent market; (2) attempted to maintain a monopoly over the asphalt shingle roof ridge vent market; and (3) leveraged its monopoly power in the asphalt shingle roof ridge vent market to foreclose competition in the separate market for roofing materials.[3]

To prevail on a claim under Section 2 of the Sherman Act, the party alleging monopolization must prove: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from the growth or development as a consequence of a superior product, business acumen, or historic accident. *Queen City*, 124 F.3d at 437.   Additionally, under Section 2, a party alleging attempted monopolization must prove that its opponent: (1) engaged in predatory or anti-competitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving

---

[3] As to the leveraging claim, according to the Third Circuit, "in order to prevail upon a theory of monopoly leveraging, a plaintiff must prove threatened or actual monopoly in the leveraged market," not mere "competitive advantage." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 206 (3d Cir. 1992).  Rotter's claim of monopoly leveraging is based solely upon his statement that GAFMC "used its monopoly power in the market for asphalt shingle roof ridge vents to foreclose competition in the separate market for roofing materials." This pleading is insufficient to establish a claim for monopoly leveraging.  Hence, Rotter's monopoly leveraging claim fails because there is no proof of a threatened or actual monopoly in the leveraged market and Rotter has failed to allege a relevant product market.

monopoly power.  *Id*. at 442.

In order to determine whether there is a monopoly or a dangerous probability of monopolization, as is also necessary in Section 1, a court must examine the relevant product market.  *Id*. at 437 and 442.  Both Section 1 and Section 2 of the Sherman Act define the relevant product market by examining the rule of reasonable interchangeability of use and the cross-elasticity of demand.  *Id*. at 442 n. 18.  As explained earlier in this opinion, Rotter fails to allege a relevant product market under Section 1.  For the same reasons, Rotter has not alleged a relevant product market under Section 2 of the Sherman Act.  Therefore, I grant GAFMC's motion to dismiss all three counts of violations of 15 U.S.C. § 2.

**C. State Law Claims**

GAFMC seeks to dismiss several of Rotter's counterclaims that rely on state law.  At this time, I deny GAFMC's motion to dismiss the state law claims of unfair competition,[4] tortious

---

[4] As to the unfair competition claim, according to the Third Circuit, "[a] claim of unfair competition under Pennsylvania law requires proof that the defendant has "passed off" the goods of one manufacturer or vendor as those of another, thus creating confusion between his own goods, and those of the rival." *Scanvec Amiable Ltd. v. Chang*, 80 Fed.Appx. 171, 180 (3d Cir. 2003) (citing to *Penn. State Univ. v. Univ. Orthopedics, Ltd.,* 706 A.2d 863, 870-71 (Pa. Super. Ct. 1998) ("The gist of the action lies in the deception practiced in 'passing off' the goods of one for that of another.") In recent years, the Pennsylvania Court of Common Pleas has begun to define unfair competition according to its definition in the Restatement (Third) Unfair Competition § 1 (1995).  *See e.g. Babiarz v. Bell Atl.-Pa., Inc.*, 2001 WL 1808554, at *9 (Pa. Com. Pl. July 10, 2001); *Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Serv., Inc.*, 1995 WL 842000, at *1-2 (Pa. Com. Pl. Oct. 18, 1995).  Under the Restatement (Third), "[o]ne who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless . . . the harm results from . . . other acts or practices of the actor determined to be actionable as an unfair method of competition."  According to Comment G of the Restatement (Third), "[a]s a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition."  Hence, tortious interference may form the basis of a claim for unfair competition.  *Id Security Sys. Canada, Inc. v. Checkpoint* Sys., *Inc.*, 249 F. Supp.2d 622, 688 (E.D. Pa. 2003).  Several judges in the Eastern District of

interference with prospective business advantage, civil conspiracy, fraud, and fraud and

misrepresentation.

---

Pennsylvania have applied the Restatement (Third) definition of unfair competition when faced with a Pennsylvania state law unfair competition claim.  *See, e.g., Synthes (USA) v. Globus Med., Inc.,* 2007 WL 2043184, at *9 (E.D. Pa. Sept. 14, 2005); *Id Security*, 249 F. Supp.2d at 688; *Air Products and Chemicals, Inc. V. Inter-Chemical, LTD, et al.,* 2003 WL 22917491, at *12 (E.D. Pa. Dec. 2, 2003); *Fresh Made*, 2002 WL 31246922, at *9.  To date, however, no appellate court in Pennsylvania has applied the Restatement (Third) to the common law tort of unfair competition.  Therefore, I deny the motion to dismiss Rotter's claim of unfair competition without prejudice to be reasserted at a later stage in litigation with the hope that, in the near future, Pennsylvania courts will provide more guidance on this issue.

## **ORDER**

      **AND NOW**, this _15th_ day of February, 2008, it is **ORDERED** that Plaintiffs' Motion to Dismiss (Doc. #46) is:

- **GRANTED** as to the antitrust claims (Counts I-IV).
- **DENIED** without prejudice to be reasserted at a later stage in litigation as to the claims of unfair competition (Count VI), tortious interference with prospective business advantage (Count VII), civil conspiracy (Count XIV), and fraud and misrepresentation (Count XV)
- **DENIED** with prejudice as to the claim of fraud.

                                            s/Anita B. Brody

                                            _____
                                            ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:               Copies **MAILED** on _____ to: